1  Annick Persinger (State Bar No. 272996)
2  **TYCKO & ZAVAREEI LLP**
   10880 Wilshire Blvd., Suite 1101
3  Los Angeles, CA 90024
4  Telephone: (510) 254-6808
   Facsimile: (202) 973-0950
5  *apersinger@tzlegal.com*

6  Shana Khader (*pro hac vice to be filed*)
7  Robert M. Devling (*pro hac vice to be filed*)
8  **TYCKO & ZAVAREEI LLP**
   2000 Pennsylvania Ave. N.W., Suite 1010
9  Washington, D.C. 20006
   Telephone: (202) 973-0900
10 Facsimile: (202) 973-0950
11 *skhader@tzlegal.com*
   *rdevling@tzlegal.com*
12
13 *Counsel for Plaintiffs and the Proposed Classes*

14              **UNITED STATES DISTRICT COURT**
15              **CENTRAL DISTRICT OF CALIFORNIA**

16
17 MICHELLE MADRIGAL, HELEN          Case No.: 2:25-cv-2375
   PANTUSO, JESSICA TEMPEST, and
18 TRACEY SUNDE, *on behalf of*       **CLASS ACTION COMPLAINT**
   *themselves and all others similarly*
19 *situated*,                        **DEMAND FOR JURY TRIAL**
20
21              Plaintiffs,
22      v.
23
24 LIVE NATION ENTERTAINMENT,
   INC. and TICKETMASTER LLC,
25
26              Defendants.
27
28

Plaintiffs Michelle Madrigal, Helen Pantuso, Jessica Tempest, and Tracey Sunde ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster LLC (collectively, "Ticketmaster"). Plaintiffs, by and through their counsel, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## **INTRODUCTION**

1.    Ticketmaster operates online marketplaces where consumers can buy and sell tickets for sports, concerts, and other live entertainment events. Ticketmaster is, by far, the largest live event ticketing company in the United States. To generate profit, Ticketmaster advertises deceptively low prices at the outset of its transactions while hiding expensive junk fees until the end of the transaction.

2.    In its scheme, Ticketmaster uses a deceptively low upfront price to lure consumers into the purchase flow for tickets—the bait. Then, once Ticketmaster has lured Plaintiffs and consumers like them into the transaction with a deceptively low price, Ticketmaster adds exorbitant junk fees (in unpredictable amounts) after Plaintiffs and consumers had already relied on the low advertised price and made the decision to buy. In other words, only after a consumer has invested time choosing an event, selected their specific tickets, made the decision to purchase those tickets based on the low advertised price, and clicked through a multi-page purchase process, do Defendants reveal the hefty mandatory fees that will be added to the total ticket prices—the switch. Thus, Plaintiffs bring this proposed class action to remedy and to end Ticketmaster's deceptive practices with respect to the variable hidden junk fees they collect when consumers purchase tickets on their desktop and mobile websites and their mobile applications.

3.     Ticketmaster advertises a deceptively low price to sell more tickets at higher prices. Indeed, industry research has demonstrated that when a ticket seller uses fees to hide the true cost of items until the end of the transaction, (i) consumers focus on the deceptively low initial base price and build purchasing commitment through several intermediate steps, and (ii) consumers will buy more tickets and tickets at higher prices because of their endowed progress when a ticket seller does not display the full price up front.[1] Thus, rather than providing clear, upfront disclosures as to the services they offer, as required by law, Ticketmaster deceives consumers by obscuring the true price of their product, which impairs consumers' decision-making process, causes consumers to pay junk fees they otherwise would not have paid, influences consumers to buy more tickets at higher prices, and prevents consumers from comparing ticket prices against Ticketmaster's competitors and even on Ticketmaster's own website.

4.     Ticketmaster is well aware that deferring disclosures of mandatory fees is a deceptive practice that is unfair to consumers. In a comment to the Federal Trade Commission ("FTC"), Live Nation explained that, "[i]n many instances, deferring disclosure of mandatory fees is inherently deceptive or unfair." Live Nation also admits that "[t]echnologically, it is no more difficult for [a] ticketing company to show the all-in price throughout the shopping and purchasing experience than it is to show it only at checkout."[2] But Ticketmaster engages in this deceptive and unfair conduct anyway. Instead of displaying the true price up front, Ticketmaster displays a deceptively low initial price to consumers, only springing fees on them at checkout after the initial low price has already been factored into consumers' purchase decision—as each click through Ticketmaster's multi-step process is designed to

---

[1] Tom Blake et al., *Price Salience and Product Choice*, 40 Marketing Science 4, pp. 619–36 (July-Aug. 2021), *available at* https://perma.cc/9BQE-E6KU.

[2] Live Nation Comment to Proposed Rule, FTC-2023-0064-3306 (Feb. 7, 2024) (emphasis added, footnote omitted).

increase consumer commitment to buy, such that consumers are more likely to spend more money at the end.

5.      Even worse, Ticketmaster selectively displays the full price (inclusive of all mandatory fees) to customers when the event is scheduled to occur in certain states—showing that Ticketmaster is capable and has its own systems set up to display pricing up front instead of deceptively hiding it at the end. Nonetheless, depending on the location of the event, regardless of where the consumer shops, Ticketmaster still uses partitioned pricing where the true amount of the tickets (inclusive of fees) is not disclosed until the end of the transaction. This means that, despite the recent wave of states that have passed anti-hidden fee laws, Ticketmaster in many instances continues to advertise a deceptively low initial price to residents of those states, surprising consumers with mandatory junk fees.

6.      To make matters worse, Ticketmaster uses a countdown clock to create a false sense of investment and urgency for consumers and to distract from and obfuscate the fact that the total purchase price at checkout is significantly higher than originally advertised.

7.      The scale of Defendants' malfeasance is enormous. In 2023, Live Nation, through Ticketmaster LLC, collected fees on 329 million tickets.[3] Extrapolated over the proposed class period, Defendants have collected unfair and deceptive fees through their drip pricing practices on as many as **1 billion tickets**.

8.      Ticketmaster's unfair and deceptive purchase flow violates the rights of consumers across the country. Accordingly, Plaintiffs bring this case to permanently enjoin these unfair and deceptive business practices and to secure actual and statutory damages, restitution, and all other appropriate relief.

---

[3] Live Nation Entertainment 2023 Annual Report, *available at* https://perma.cc/L8LM-HVTM, at 5.

CLASS ACTION COMPLAINT

## JURISDICTION AND VENUE

9.     This Court has original subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) the amount in controversy exceeds $5 million, exclusive of interest and costs; (ii) the number of class members exceeds 100, and (iii) minimal diversity exists because many class members, including some Plaintiffs, have different citizenships from the Defendants.

10.     This Court has general personal jurisdiction over both Defendants because each Defendant maintains its principal place of business in California.

11.     This Court has specific personal jurisdiction over both Defendants because both Defendants have purposefully availed themselves of the laws, rights, and benefits of the State of California. Each Defendant has engaged in activities including (i) providing services throughout the United States from this judicial district; (ii) conducting substantial business in this forum; and/or (iii) engaging in other persistent courses of conduct and/or deriving substantial revenue from services provided in California and in this judicial District.

12.     This Court has supplemental jurisdiction to hear all state law statutory and common law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendants are based in this District, coordinate the purchase flow in this District, and have caused harm to Plaintiffs and the Class Members in this District.

## PARTIES

14.     **Plaintiff Michelle Madrigal** is a natural person and is a resident of California.

15.     On September 28, 2024, Plaintiff Madrigal purchased three tickets for a live event in Nevada from her home in California from Ticketmaster online. The purchase totaled $1,112.15.

16.     Ticketmaster did not initially advertise a price that included all mandatory fees.

17.     Ticketmaster initially advertised the three tickets as costing $290.00 per ticket ($870.00 in total).

18.     Ticketmaster charged Plaintiff Madrigal $163.85 in added fees that were not initially disclosed, and $78.30 in taxes.

19.     Plaintiff Madrigal was not aware that the three tickets included $163.85 in additional taxable fees when she first selected the tickets.

20.     The deceptively low initially advertised price of $290.00 was a substantial factor in Plaintiff Madrigal's decision to purchase the tickets.

21.     As a result of the pressure exerted by Ticketmaster in its purchase flow as described herein, Plaintiff Madrigal purchased the tickets despite the addition of the previously undisclosed fees.

22.     On or about June 23, 2023, Plaintiff Madrigal purchased tickets for a blink-182 concert occurring in California from her home in California from Ticketmaster online.

23.     Ticketmaster advertised the blink-182 tickets at an artificially low price that did not include all mandatory fees.

24.     The deceptively low initially advertised price was a substantial factor in Plaintiff Madrigal's decision to purchase the tickets.

25.     As a result of the pressure exerted by Ticketmaster in its purchase flow as described herein, Plaintiff Madrigal purchased the tickets despite the addition of the previously undisclosed fees.

26.     **Plaintiff Helen Pantuso** is a natural person and is a resident of Florida.

27.     On March 4, 2025, Plaintiff Pantuso purchased two tickets to a live event in New Jersey from her home in Florida from Ticketmaster online. The purchase totaled $327.95.

28.     Ticketmaster did not initially advertise a price that included all mandatory fees.

29.     Ticketmaster initially advertised the two tickets as costing $135.00 per ticket ($270.00 in total).

30.     Ticketmaster charged Plaintiff Pantuso $57.95 in added fees that were not initially disclosed.

31.     Plaintiff Pantuso was not aware that the two tickets would cost an additional $57.95 in fees when she selected the tickets.

32.     The deceptively low initially advertised price of $135.00 was a substantial factor in Plaintiff Pantuso's decision to purchase the tickets.

33.     As a result of the pressure exerted by Ticketmaster in its purchase flow as described herein, Plaintiff Pantuso purchased the tickets despite the addition of the previously undisclosed fees.

34.     On or about January 10, 2025, Plaintiff Pantuso purchased three tickets to a live event in Florida from her home in Florida from Ticketmaster online. The purchase totaled $935.20.

35.     Ticketmaster did not initially advertise a price that included all mandatory fees.

36.     Ticketmaster initially advertised the three tickets as costing $259.00 per ticket ($777.00 in total).

37.     Ticketmaster charged Plaintiff Pantuso $158.20 in added fees that were not initially disclosed.

38.     Plaintiff Pantuso was not aware that the three tickets included $158.20 in additional fees when she selected the tickets.

CLASS ACTION COMPLAINT

39.    The deceptively low initially advertised price of $259.00 was a substantial factor in Plaintiff Pantuso's decision to purchase the tickets.

40.    As a result of the pressure exerted by Ticketmaster in its purchase flow as described herein, Plaintiff Pantuso purchased the tickets despite the addition of the previously undisclosed fees.

41.    **Plaintiff Jessica Tempest** is a natural person and is a resident of New York.

42.    On or about December 11, 2024, Plaintiff Tempest purchased two tickets to a live event show in New York from her home in New York from Ticketmaster online. The purchase totaled $210.00.

43.    Ticketmaster did not initially advertise a price that included all mandatory fees.

44.    Ticketmaster advertised the two tickets as costing $90.00 per ticket ($180.00 in total).

45.    Ticketmaster charged Plaintiff Tempest $60.00 in added fees that were not initially disclosed.

46.    Plaintiff Tempest was not aware that the three tickets included $60.00 in additional fees when she selected the tickets.

47.    The deceptively low initially advertised price of $90.00 was a substantial factor in Plaintiff Tempest's decision to purchase the tickets.

48.    As a result of the pressure exerted by Ticketmaster in its purchase flow as described herein, Plaintiff Tempest purchased the tickets despite the addition of the previously undisclosed fees.

49.    **Plaintiff Tracey Sunde** is a natural person and is a resident of Illinois.

50.    On February 23, 2024, Plaintiff Sunde purchased a ticket to a live event show in Illinois from her home in Illinois from Ticketmaster online. The purchase totaled $74.26.

51.    Ticketmaster did not initially advertise a price that included all mandatory fees.

52.    Ticketmaster initially advertised the ticket as costing $49.50 per ticket.

53.    Ticketmaster charged Plaintiff Sunde $19.56 in added fees that were not initially disclosed, and $5.20 in taxes.

54.    Plaintiff Sunde was not aware that the ticket included $19.56 in additional fees when she first selected the ticket.

55.    The deceptively low initially advertised price of $49.50 was a substantial factor in Plaintiff Sunde's decision to purchase the ticket.

56.    As a result of the pressure exerted by Ticketmaster in its purchase flow as described herein, Plaintiff Sunde purchased the ticket despite the addition of the previously undisclosed fees.

57.    **Defendant Live Nation Entertainment, Inc.** is incorporated under the laws of the State of Delaware, with its principal place of business in Beverly Hills, California.

58.    **Defendant Ticketmaster LLC** is a limited liability company registered under the laws of the Commonwealth of Virginia, with its principal place of business in Beverly Hills, California. Ticketmaster LLC is a wholly owned subsidiary of Live Nation.

59.    Ticketmaster LLC is the ticketing business of Live Nation.

**ADVERTISING A DECEPTIVELY LOW PRICE AT THE OUTSET OF A TRANSACTION ONLY TO ADD A FEE AT THE END IS INHERETLY DECEPTIVE AND UNFAIR**

60.    Last minute, mandatory fees like those charged by Ticketmaster are called "junk fees" by the Federal Trade Commission ("FTC").[4] This type of Junk

---

[4] As defined by the FTC, "junk fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer including goods or services that consumers would reasonably assume to be included within the

Fee pricing strategy has been referred to as "bait and switch" advertising, and is effected by the use of partitioned pricing, or "drip pricing," where only the initial low price is shown until the end of the transaction when the true cost inclusive of fees is revealed.

61.    The use of deceptively low prices with added junk fees at the end of the transaction is inherently unfair, was condemned by the White House in 2024, and has been explicitly outlawed by state legislatures in several states in recent years.

62.    As President Biden explained in his 2024 State of the Union address, "junk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills[.]"[5]

63.    In fact, the White House estimated that junk fees cost Americans over $90 billion each year.[6]

64.    Large, sophisticated companies—like Defendants—with large, sophisticated marketing departments know that junk fees trick consumers into paying more for a good or service.

65.    One of the most common junk fee pricing techniques is partitioned or "drip pricing," where a company uses a deceptively low price to entice the consumer

---

overall advertised price" or fees that are "hidden," such as those "disclosed only at a later stage in the consumer's purchasing process or not at all." *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), *available at* https://perma.cc/CLQ6-YYQS (cleaned up).

[5] *President Biden's State of the Union Address*, White House, https://www.whitehouse.gov/state-of-the-union-2023/ (last visited Aug. 9, 2023).

[6] *Readout of White House State Legislators Convening on Junk Fees*, White House (April 24, 2024), *available at* https://web.archive.org/web/20250106193703/https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/24/readout-of-white-house-state-legislators-convening-on-junk-fees/ (archived screenshot of White House statement; original statement is no longer accessible).

CLASS ACTION COMPLAINT

to enter the transaction and then does not disclose the total price of a product or service until late in the purchase process—after the consumer has already decided to buy based on the deceptively low price advertised at the outset.

66.    Consumers who are not provided the complete price until checkout are likely to proceed with their purchase even after the junk fee is revealed because they have already factored the deceptively low price into their decision and built purchasing commitment as they clicked through the transaction. Because of Ticketmaster's deceptively low advertised prices, which do not include fees, and because the process of clicking through the transaction builds purchasing commitment, consumers proceed with the transaction even after exorbitant and unpredictable fees have been added despite their better judgment—despite the fact that continuing to search for cheaper prices would be more "optimal"—because consumers want to avoid "the cost of the time and cognitive effort involved" in continuing to search for a product or service.[7]

67.    Once a consumer decides what to buy, she is unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming her search.[8]

68.    In other words, omitting junk fees from the advertised cost of a product or service through partitioned pricing induces consumers to buy based on deceptively low prices such that at the end of the purchase flow, which is designed to build their commitment to purchase with each click, consumers pay higher total prices than they otherwise would.

69.    Indeed, as companies that engage in junk fee practices are aware, consumers choose products or services based on the advertised "base price," and not

---

[7] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16–17, https://perma.cc/A4GT-NUW7.
[8] *Id*. at 17.

based on the price inclusive of fees, which is obscured by partitions in the purchase flow.[9]

70.     Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip prices . . . consumers more frequently fail to identify the cheapest offer."[10]

71.     In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[11]

72.     As the FTC's Bureau of Economics has explained, the use of deceptively low prices at the outset of transactions while hiding junk fees until the end of the transaction adds steps to the process of determining the actual price of a good or service, which forces consumers to pay more than they would if initially presented with full, complete prices.[12]

73.     As a result, when they reach the end of the transaction after they have already factored the low price into their decisions and built purchasing commitment as they clicked through the process, consumers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision

_____

[9] Alexander Rasch et al., *Drip Pricing & Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior & Org. 353 (2020), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("[B]uyers . . . . based their purchase decision exclusively on the base price").
[10] *Id.*
[11] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, Mkting. Science (forthcoming), at 4, *available at* https://www0.gsb.columbia.edu/mygsb/faculty/research/pubfiles/26100/Santana%20Dallas%20Morwitz%20Marketing%20Science%20forthcoming.pdf.
[12] Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, *supra* n.7 at 2–3.

CLASS ACTION COMPLAINT

that may result in a more costly [purchase], or both."[13]

74.    The FTC has thus characterized junk fees as especially egregious when they are hidden (i.e., "disclosed only at a later stage in the consumer's purchasing process or not at all"), because openly disclosed junk fees would enable consumers to determine that the cost of a given product or service is not favorable relative to the cost charged by competitors and choose to do business elsewhere.[14]

75.    Given this, it is no surprise companies are motivated to use deceptively low prices at the outset while hiding junk fees through drip pricing for as long as possible in the search and purchase process, as duping consumers into paying junk fees—by advertising artificially low prices and forcing users through a partitioned purchase flow pressured by a countdown clock—generates substantial revenue.

76.    In many instances, companies keep the advertised price at the outset artificially low and pass some of the cost of the item into the junk fee that consumers do not see until the end, instead of adding the increased cost of the item to the low advertised price at the outset, which would deter consumers from being lured into the purchase flow. This allows companies to compound the benefit they obtain through these practices by increasing junk fees at a higher rate than they increase the base price of the underlying product or service itself.[15] As a result, the product or

---

[13] *Id.* at 4; *see also* David Adam Friedman, *Regulating Drip Pricing*, 31 Stan. L. & Pol'y Rev. 51, 67 (2020) ("[S]ellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . . Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu et al., *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).

[14] *See, e.g.*, *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, *supra* n.4 ("After a market leader took unilateral action to phase out hidden fees, the platform 'lost significant market share and abandoned the policy after a year because consumers perceived the platform's advertised prices to be higher than its competitors' displayed prices.'" (citation omitted)).

[15] *Id.*

CLASS ACTION COMPLAINT

service appears cheaper to consumers than competitors' products or services, even though the total cost of the product or service, inclusive of junk fees, is equally, if not more, expensive than those other companies' products or services.[16]

77.     Companies are also able to increase hidden junk fees without suffering meaningful market consequences.[17] In particular, companies can charge excessive junk fees in part because drip pricing impedes fair, honest, and free market competition as they are not adequately disclosed alongside the base price.[18]

78.     Hence, by using a deceptively low price while hiding the true cost of items inclusive of junk fees, companies can charge excessive junk fees while skirting economic consequences, as shrouding the fee encourages consumers to make their purchasing decisions based on only the base price, not inclusive of junk fees.

79.     Meanwhile, competitor companies and consumers face the consequences. Companies that advertise deceptively low advertised prices that do not include hidden junk fees will lure consumers away from properly behaving competitors that do not engage in such practices (and thus appear to charge higher prices) and will earn more profit than those competitors.[19]

80.     Using deceptively low prices and then later adding hidden junk fees also generates significant burden for individual consumers, who "pay upward of twenty percent more [when a company engages in drip pricing] than when the actual price was disclosed upfront."[20]

81.     Moreover, the conduct of drip pricing runs afoul of the FTC Act itself.

---

[16] *See id.*

[17] Rasch. *Drip Pricing & Its Regulation: Experimental Evidence*, *supra* n.9.

[18] *Id.* ("[F]irms fiercely compete in base prices but not in drip prices," so "total price increases when firms use drip pricing").

[19] *Id.* ("[W]here there is uncertainty about the drip size, sellers with a high drip-price limit can earn profits above the competitive level.").

[20] *See Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, *supra* n.4 (explaining that hidden junk fees therefore "impose substantial economic harms on consumers").

CLASS ACTION COMPLAINT

*See* 15 U.S.C. § 45(a)(1) (declaring unlawful "unfair or deceptive acts or practices in or affecting commerce").

82. FTC's guidance on bait and switch advertising has long stated that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a).

83. More recently, the FTC's Trade Regulation on Unfair or Deceptive Fees, set to take effect in May 2025, "specifies that it is an unfair and deceptive practice for businesses to offer, display, or advertise any price of live-event tickets . . . without clearly, conspicuously and prominently disclosing the total price," authorizing the FTC to seek civil penalties against companies that violate the FTC Act in this way.[21]

84. Put simply, advertising an artificially low price at the outset to lure consumers into the transaction while adding on exorbitant and variable junk fees at the very end is bad for consumers and is bad for competition.

## **DEFENDANTS' CONDUCT GIVING RISE TO PLAINTIFFS' CLAIMS**

85. Defendant Live Nation is the largest live entertainment company in the world. It operates in 49 countries and connects hundreds of millions of fans with live events every year.[22] Live Nation maintains several lines of business including owning and operating live-event venues, managing artists, providing marketing services, and selling event tickets.

86. Live Nation controls about 70% of the market for ticketing services for live entertainment events.

---

[21] FTC, "Trade Regulation Rule on Unfair or Deceptive Fees" Summary, *available at* https://www.federalregister.gov/documents/2025/01/10/2024-30293/trade-regulation-rule-on-unfair-or-deceptive-fees.

[22] Live Nation Annual Report, *supra* n.3 at 2.

CLASS ACTION COMPLAINT

87.     Live Nation refers to "Ticketmaster" as "its ticketing business."[23]

88.     According to Live Nation, "Ticketmaster provides ticket sales, ticket resale services and marketing and distribution globally through www.ticketmaster.com and www.livenation.com and our mobile apps . . . . Ticketmaster serves approximately 10,000 clients worldwide across multiple event categories, providing ticketing services for leading arenas, stadiums, festival and concert promoters, professional sports franchises and leagues, college sports teams, performing arts venues, museums and theaters."[24]

89.     Given Defendants' majority share of the market, individuals looking to buy and sell tickets for most major sporting, entertainment, theater, and other events are thus forced to use Ticketmaster's services as consumers often have no choice but to purchase tickets through Ticketmaster. Indeed, the Department of Justice has recently filed an antitrust case against Ticketmaster for its anti-competitive practices. *See United States v. Live Nation Entertainment, Inc.*, No. 1:24-cv-03973-AS-SLC, ECF No. 4 (S.D.N.Y. May 24, 2024).

90.     Consumers may purchase tickets at Defendants' desktop and mobile websites (https://www.livenation.com and https://www.ticketmaster.com) or through Defendants' mobile applications (the "Apps"). Consumers can use Defendants' websites or Apps to search for and purchase tickets to events happening across the United States.

91.     As explained in greater detail below, Ticketmaster advertises an artificially low price, then uses partitions, a countdown clock, and urgent pop-up warnings in its purchase flow to pressure users to pay added junk fees at the end of the transaction. These junk fees are nothing more than a way to pad Defendants' bottom line. In fact, Live Nation "expect[s] that revenue from primary ticketing services, which consists primarily of our portion of per ticket convenience charges

---

[23] *Id.*
[24] *Id.* at 5.

CLASS ACTION COMPLAINT

and per order service fees, will continue to comprise the substantial majority of our Ticketing segment revenue."[25] Regardless of whether the ticket is sold on the primary or secondary market, "[r]evenue from our ticketing operations primarily consists of service fees charged at the time a ticket for an event is sold."[26]

92.    Ticketmaster's pricing strategy is entirely optional. As Live Nation itself represented to the FTC, it is entirely feasible for Ticketmaster to display the full price of tickets up front, and consumers "want to know the all-in price at the outset of their search." Live Nation Comment to Proposed Rule, FTC-2023-0064-3306 (Feb. 7, 2024), https://www.regulations.gov/comment/FTC-2023-0064-3306. And, when events are set to occur at venues in certain states and, Ticketmaster *does* initially display an all-in price. Of the nearly 620 million tickets Defendants sold in 2023, over 290 million did not include hidden fees.

93.    As detailed herein, though, for the majority of tickets they sell, Ticketmaster uses a deceptive purchase flow that emphasizes an artificially low price that does not include fees at the outset of the transaction. After Ticketmaster lures consumers in with artificially low prices that do not include fees, Ticketmaster's purchase flows then require customers to complete their transactions while under the pressure of a countdown clock. If the clock runs out, the consumer loses the tickets she was trying to purchase and must begin the transaction from the beginning.

94.    Throughout most of the transaction, Ticketmaster advertises artificially low ticket prices that do not include Ticketmaster's fees because Defendants know (i) that consumers will focus only on the deceptively low initial price and (ii) that consumers will then buy more tickets and tickets at higher prices than they would have if the fees had been displayed throughout the transaction.[27]

---

[25] *Id*. at 14.
[26] *Id*. at 46.
[27] *See* Blake, *supra* n.1 at 619–36.

**A.    Ticketmaster's deceptive purchase flow.**

95.    When Ticketmaster's purchase flow uses an artificially low price at the outset that does not include an added junk fee until the end of the transaction, consumers are drawn into the purchase flow by that deceptively low price. Consumers then only have the artificially low advertised price to factor into their decision making while they must click through multiple screens under the pressure of a countdown clock—before they find out the true price inclusive of exorbitant junk fees.

96.    The following example shows a search that took place online from an IP address in California for an event set to occur at a venue in Washington, D.C. In this example, even though Ticketmaster itself acknowledges that California is a state where the true cost should be revealed at the outset, Ticketmaster displays a deceptively low ticket price without fees through several stages of the transaction.

97.    First, as shown in the example below, after the user, who was shopping on www.ticketmaster.com while sitting in California, identified an event out-of-state, in this case the District of Columbia, the Ticketmaster website displays deceptively low ticket prices that do not include added fees. Alongside the specific seats that are available, Ticketmaster lists the price of each ticket. Nothing on the screen indicates that customers will be charged additional fees.

//
//
//
//
//
//
//
//
//



98.    Second, after the consumer selects the specific tickets they wish to purchase based on the price information, Ticketmaster advertises the deceptively low "SUBTOTAL" price of the tickets in bold near the "Next" button without including fees. Again, nowhere does Ticketmaster mention that an exorbitant junk fee will be tacked on to the total price at the end.



99.     While Ticketmaster includes a bold Subtotal that emphasizes the deceptively low price that does not include added fees, in smaller font above the bolded subtotal, Ticketmaster mentions for the first time, that the price is "+ Fees." The problem is that Ticketmaster still intentionally avoids listing the actual added junk fee amount; so, while users may have some idea that a fee may apply, they still have no numerical information to factor into their purchasing decision. Instead, because there is no indication of the amount of the fees Ticketmaster will charge, the nature of the fees, or whether they are government mandated, users continue to use the deceptively low advertised price that does not include fees to make their purchasing decision as they click through Ticketmaster's pressured purchase flow.

100.     Even if the consumer clicks on the "+ Fees" link, Ticketmaster still does not state the amount of the fees that will be added. Thus, even those that clicked this link still anchor their decision-making on the only price available to them—the deceptively low price that does not include fees. Instead of revealing the amount that will be charged in fees, when users click on the link, Ticketmaster redirect the customer to a webpage purportedly explaining how ticket prices and fees are determined.[28] But that webpage does not indicate the amount of the fees Ticketmaster will charge, the nature of the fees that will be charged on the specific tickets the customer has selected, or whether the fees are government mandated.

101.     After the consumer presses "Next" on the pop-up screen, Ticketmaster redirects the customer to a "Sign In" page. The Sign In page is yet another barrier that causes users to further commit to the purchase as they enter information before they ever learn the true cost of the tickets inclusive of junk fees. In that regard, the customer must sign in to her Ticketmaster account or create an account before being able to finalize the purchase.

---

[28] "How Are Ticket Prices & Fees Determined?" *Ticketmaster* (last accessed March 10, 2025), https://perma.cc/FF87-VNK5.

102.     To make matters worse and to add pressure to further interfere with user decision-making, in the upper right corner of the "Sign In" page, Ticketmaster includes a countdown clock. The approximately eight-minute countdown clock adds pressure designed to interfere with consumers' decision making and ensures that users are rushed to complete the purchase—despite the exorbitant fees tacked on at the end of the transaction after consumers are well down the path to purchase.

103.     After signing into or creating a Ticketmaster account, finally, Ticketmaster redirects the consumer to the final "CHECKOUT" screen. The clock, which began to run on the "Sign In" screen, continues to countdown the remaining time. On the "CHECKOUT" screen, Ticketmaster displays the full price of the selected ticket for the first time.



104.     In the image above, a customer who had previously selected two tickets advertised at $32.00 each (or $64.00 together) is presented with a screen depicting the "TOTAL." The total price for the two tickets after Ticketmaster has added its fees, and after mandatory taxes, is $112.06.

105.     And even still, Ticketmaster keeps its junk fees hidden as it discreetly

CLASS ACTION COMPLAINT

tucks them into the final price without breaking down the total fee amount that has been added. In other words, Ticketmaster has done nothing on this screen to indicate that additional, mandatory fees have been tacked onto the final price and does not break down the total price to state that $41.50 in fees have been added to the $64.00 purchase. Ticketmaster's failure to include a breakdown of the total fee amount is all the more glaring given that Ticketmaster *does* indicate the amount of the total attributable to tax in the total price (i.e., here, $6.56). Instead, as shown below, users must click a dropdown arrow to find the breakdown of the fees that Ticketmaster added to the initially advertised low price. For the first time in the transaction, and only if users click the dropdown menu, Ticketmaster lists various mandatory fees, including a "Service Fee," a "Facility Charge," and an "Order Processing Fee." The fees total $19.50, $16.00, and $6.00, respectively. In the foregoing example, these fees increased the advertised price by 65%, or $41.50 for the single transaction.



106. To ensure that users cannot fully consider this information or factor it into their decision, while the consumer reviews this information (seeing the full price for the first time), the countdown clock continues to tick. In the approximately eight minutes the countdown clock runs, customers (1) sign into sign up for a Ticketmaster account, (2) must review all of the information on the "CHECKOUT" screen regarding fees and add-on items, such as parking, ticket insurance, and donations, (3) are expected to read and agree to Defendants' "Terms of Use," which, if printed on standard 8.5"x11" paper would total 23 pages, and (4) must understand the increase in the cost of their tickets.



107. Ticketmaster further pressures consumers into completing their purchases by using pop-up notifications. For example, in the image above, Ticketmaster warns potential customers at around the three-minute mark that "Tickets are selling fast. Get yours now before they're gone."

108.    If a customer is not able to understand why the cost of the selected tickets increased within the eight-minute countdown, the tickets become "expired," and the customer must start over. For example, in the screenshot below, a customer who failed to purchase the selected tickets for $112.06 within the countdown clock faces a pop-up notification stating "Time's Up. Your time limit to secure these tickets has expired. You will need to select new tickets to purchase."



**B.    Ticketmaster's use of its deceptively low prices without added junk fees depends on the state in which the event will occur.**

109.    Defendants decide whether to use their deceptive initial low pricing practices based on where the event is occurring, not based on where the consumer is purchasing tickets.[29] Thus, for the example above, every consumer in California,

---

[29] Defendants state that "any events in New York, Tennessee, Connecticut, California, Maryland, Colorado, Massachusetts, Minnesota and North Carolina will automatically have all-in pricing shown." "How Are Ticket Prices & Fees Determined?", *supra* n.28. But for events occurring in other states, all customers may still be subject to deceptive drip pricing.

CLASS ACTION COMPLAINT

1  New York, Illinois, Florida, and Washington, D.C. would see the same partitioned

2  prices.

3      110.    As another example, to consumers throughout the country,

4  Ticketmaster advertises the possibility of booking a ticket to "Disney on Ice Presents

5  Let's Dance" at NRG Stadium in Houston, Texas, on April 12, 2025, for as low as

6  $20.00. However, after going through the same checkout process outlined above, the

7  price of the "$20.00" ticket nearly ***_doubles_*** to $39.41 after adding $16.97 in

8  Ticketmaster's junk fees and taxes of $2.44. Again, regardless of from where the

9  consumer is completing the transaction, Ticketmaster advertises the lowest-priced

10  tickets as $20 when they actually cost $36.97 plus tax.

11      111.    By deciding whether to use drip pricing based on where the event is

12  occurring, then using the same drip-pricing practices throughout the country,

13  Ticketmaster continues to use drip pricing in jurisdictions that have hidden fee laws.

14  For example, Ticketmaster included hidden fees when Plaintiff Madrigal purchased

15  tickets for an event in Nevada from her home in California despite California's law

16  prohibiting the use of junk fees.

17      112.    As shown by the foregoing examples, Ticketmaster's deceptive

18  purchase flow takes advantage of consumers' known focus on the artificially low

19  initially advertised price that does not include fees. By including the countdown

20  timer, Ticketmaster effectively prevents consumers from comparing prices across

21  different platforms and making an informed choice about where to purchase their

22  tickets. Indeed, Ticketmaster uses these deceptive tactics to ensure that consumers

23  become invested in the decision to buy and get swept up in the momentum of events

24  such that consumers still make the purchase on Defendants' platform, even as they

25  add hefty fees at the very end of the transaction. In other words, Ticketmaster employ

26  deceptive and unfair "digital dark patterns" that have the effect of obscuring,

27

28

CLASS ACTION COMPLAINT

subverting, and impairing consumer autonomy and decision-making in purchasing tickets, resulting in harm to consumers.[30]

### C. Ticketmaster's purchase flow is designed with dark patterns to interfere with consumer decision making to ensure reliance on the deceptively low advertised price.

113.    Ticketmaster uses "dark patterns" to ensure that when users reach the final screen the momentum of events will pressure consumers to purchase despite the addition of exorbitant fees to the total price of the tickets. *Veera v. Banana Republic, LLC*, 211 Cal. Rptr. 3d 769, 778 (Cal. Ct. App. 2016) ("In short, plaintiffs had a legally protected interest in knowing from the outset, when they started to shop, the true prices of the items they chose to buy."). Ticketmaster's dark patterns ensure that users have already decided to buy tickets based on the artificially low price advertised at the outset and throughout the transaction even though the true cost has been revealed to as a much higher amount. Ticketmaster' dark patterns—online practices that trick or manipulate consumers into making choices that they would not have otherwise made—include:

a.    **<u>Scarcity</u>**: Ticketmaster creates pressure to purchase by creating a false sense of high demand when it includes filler pages that state that the event is selling fast, is likely to sell out, is the last ticket remaining in a particular section, and/or how many users purportedly viewed the ticket in the last hour;

---

[30] Fed. Trade Comm'n, *Bringing Dark Patterns to Light*, Staff Report (September 2022), *available at* https://perma.cc/L8TS-77LC (finding that "[s]ome dark patterns manipulate consumer choice by inducing false beliefs", including the use of "countdown timers on offers that are not actually time-limited, claims that an item is almost sold out when there is actually ample supply, and false claims that other people are also currently looking at or have recently purchased the same product."); *see also id.* at 9 ("Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction, after the consumer already has spent significant time selecting and finalizing a product or service plan to purchase.").

CLASS ACTION COMPLAINT

b.  **Urgency**: Ticketmaster also ensures that consumers complete their purchase at the end of the transaction despite the increased price with added fees by creating a false sense of urgency with a countdown clock that ticks down throughout the transaction. Ticketmaster also uses pop up warnings to suggest tickets are "selling fact" if users so much as pause on a page in the transaction;

c.  **Obstruction**: Ticketmaster stops users from comparing prices because the overall amount is hidden behind multiple stages of the transaction, including after the consumer has provided personally identifying information;

d.  **Information Hiding**: Ticketmaster hides the true price of the tickets until users have built purchasing commitment through multiple steps in the transaction, finally disclosing the true price by adding opaquely denominated "fees." Even after getting to the final page, the amount of fees is hidden in a dropdown list that is only visible if the consumer inquires as to the change in price;

e.  **Interface Interference**: Ticketmaster uses style and design, including a clock that pops up and greys out a page if a user pauses long enough to read it and dropdown lists, to distract and misdirect attention from the true amount of fees disclosed only at the very end of the transaction;

f.  **Coerced Action**: Ticketmaster forces registration prior to disclosing the true number of tickets by requiring users to provide contact information and to sign in or sign up, further inhibiting consumers' ability to price compare.

114.    Ticketmaster's use of dark patterns has benefited them through the collection of inadequately disclosed fees and has deprived consumers of the ability to make informed purchasing decisions.

115.    Adding to the confusion, there does not appear to be any standardization for how fees are set. Considering the "Service Fee" as an example, which can range from less than 1% of the ticket cost to 48%[31], while the nominal cost of the Order Processing Fee ranged from $3.95 to $6.00. Other fees that Ticketmaster charges—such as the Service Fee and the Facility Charge—also lack any discernable formula for how they are set. Thus, even a repeat consumer cannot anticipate the amount of the fees that Ticketmaster will add to the advertised cost prior to checkout.

**D.    Defendants' arbitration clause and class action waiver are unenforceable.**

116.    Although Defendants' Terms of Use agreement contains a purported mandatory arbitration agreement and class action waiver, those provisions are unenforceable—as the Ninth Circuit recently determined.

117.    Specifically, the Terms of Use agreement contains a section that Defendants titled "Mandatory Arbitration Agreement and Class Action Waiver." *See* § 17. In that section, Defendants seek to limit litigation to individual arbitration conducted by an entity called New Era ADR.

118.    In *Heckman v. Live Nation Entertainment, Inc.*, 120 F.4th 670 (9th Cir. 2024), the U.S. Court of Appeals for the Ninth Circuit affirmed this Court's ruling that the arbitration agreement in Section 17 of Defendants' Terms of Use was void for being unconscionable. The Ninth Circuit held that New Era ADR's nonsensical

---

[31] In the "Disney on Ice" example referenced in ¶ 68, Defendants charge a $9.55 "Service Fee" and a $5.42 "Order Processing Fee" on what is purportedly a $20.00 ticket.

arbitration rules made it "impossible for plaintiffs to present their claims on equal footing to Live Nation." *Id*. at 688.

119.   The current version of Defendants' Terms of Use is the same as the Terms of Use declared void in *Heckman*.[32] Furthermore, New Era ADR has not made any substantive changes to its arbitration procedures that would warrant a different outcome in this case.[33]

120.   The Terms of Use are substantively unconscionable for all the same reasons explained in *Heckman* and are procedurally unconscionable because of the coercive tactics used to force consumers to accept its contract of adhesion.

121.   Even without *Heckman*'s support, consumers have not formed arbitration agreements with Defendants and the terms could not be enforced due to Defendants' coercive sales practices, detailed above. Defendants use high-pressure practices, including countdown timers, pop-up warnings, and threats of releasing the selected tickets if customers do not finalize their purchase in approximately eight minutes.

122.   Furthermore, without an arbitration agreement, the class-action waiver contained in the Terms of Use is unenforceable. *Discover Bank v. Superior Ct.*, 113 P.3d 1100, 1110 (Cal. 2005).

**E.    Defendants know their practice of hiding fees induces consumers to buy more tickets and to buy tickets at higher prices.**

123.   The deceptive conduct described above was by design, as Defendants implemented it to pad their profits at the expense of consumers. Independent testing has shown that when consumers purchasing live-event tickets are presented with an

---

[32] "Terms of Use," Live Nation, *available at* https://help.ticketmaster.com/hc/en-us/articles/10468830739345-Terms-of-Use (stating that the Terms of Use was last updated July 2, 2021).

[33] *Rules & Procedures*, New Era ADR 42–44 (Dec. 18, 2024), *available at* https://www.neweraadr.com/wp-content/uploads/2024/12/New-Era-ADR-Rules_January-2025.pdf (explaining the changes made to the rules and procedures over time).

all-in price including fees or initially presented a lower ticket price with mandatory fees added later in the transaction, consumers consistently spend more under the drip pricing sales tactic.

124.    In a peer-reviewed industry study, a competitor performed testing to determine whether customers spent more when it used an "up front-fee (UF) strategy, where the site showed consumers the final price, including fees and taxes, from their very first viewing of ticket inventory" or "a back-end-fee (BF) strategy, where mandatory fees were shown only after consumers had selected a particular ticket and proceeded to the checkout page."

125.    The results of that study confirmed that consumers buy more tickets and at higher prices when fees are not disclosed until the end. That is, published consumer research based on this "A/B" testing confirmed that, when the competitor displayed the true price of the ticket with fees at the outset, consumers were dissuaded from purchasing tickets compared to when fees were hidden until the end of the transaction.[34]

126.    The study, which was published in a leading, peer-reviewed academic publication devoted to marketing science, concluded that "disclosing fees upfront reduces both the quantity and quality of purchases."[35] It also concluded that the sequential partitioned pricing "makes price comparisons difficult and results in consumers spending more than they would otherwise."[36] As the highest volume tickets seller in the country, Defendants are likely aware of this research.

127.    Besides the independent research, the deceptive nature of Ticketmaster's hidden fees has been widely reported for years. Hundreds of articles have been written criticizing Ticketmaster for its deceptive trade practices.[37]

---

[34] Blake, supra n.1 at 619–36.
[35] Id. at 619.
[36] Id.
[37] E.g., Ethan Millman, "FTC Cracks Down on Hidden Concert-Ticket Fees,"

1    128.   Moreover, since the enactment of several hidden fee laws across the

2    country, Ticketmaster has begun using "All-In Pricing" for some events.[38]

3    According to Ticketmaster, All-In Pricing "means [customers will] see the cost of

4    the ticket up front, including fees (before taxes)."

5    129.   Yet despite being aware of various laws declaring the drip-pricing

6    practices they use as deceptive, Ticketmaster continues to advertise artificially

7    deflated ticket prices regardless of where the consumer purchases the ticket. For

8    example, as explained above, California residents continue to pay junk fees for

9    events occurring in other states.

10    130.   In a comment to the FTC's proposed rule to ban hidden fees, Live

11    Nation wrote:

12         It is, of course, possible to communicate the true price of a ticket with
          a "face value" amount and conspicuous disclosures of fees. But why

13         should it be any work at all for a consumer to see the all-in price?

14         **Technologically, it is no more difficult for the ticketing company to**

15         **show the all-in price throughout the shopping and purchasing**
          **experience than it is to show it only at checkout.** And while the

16

17    *Rolling     Stone*     (Dec.    17,    2024),    available    at
      https://www.rollingstone.com/music/music-news/ftc-bans-hidden-ticket-fees-

18    1235208143/; Natalie Sherman, "Ticketmaster Settles $6M Class Action Lawsuit

19    Over    Hidden    Fees," *Lawyer Monthly* (Jan. 30, 2025), available    at
      https://www.lawyer-monthly.com/2025/01/ticketmaster-settles-6m-class-action-

20    lawsuit-over-hidden-fees/ (describing Defendants' six-year fight in Canadian courts

21    for the same hidden fee practice); Joey Garrison, "Biden Muscles Ticketmaster,
      SeatGeek to Scrap Hidden Ticket Fees After Taylor Swift Debacle," USA Today

22    (June    15,    2023),    available    at
      https://www.usatoday.com/story/news/politics/2023/06/15/live-nation-seatgeek-

23    scrap-hidden-fees-amid-pressure-from-biden/70319147007/;    Mark    Dent,    "The

24    Sneaky Economics of Ticketmaster," *The Hustle* (Dec. 11, 2022), available at

25    https://thehustle.co/the-sneaky-economics-of-ticketmaster.
      [38] "All-In Pricing: What it Means," Ticketmaster (Feb. 11, 2025), *available at*

26    https://blog.ticketmaster.com/all-in-pricing-explained/ ("Some states have started to

27    pass laws requiring all-in pricing, so any events in New York, Tennessee,
      Connecticut, California, Maryland, Minnesota, North Carolina, Colorado and

28    Massachusetts automatically have all-in pricing shown.").

distinction between face value and fees is real and important among those who collaborate to put on live entertainment events, consumers just want to know how much it will cost to see the show or game. They want to know the all-in price at the outset of their search.

. . .

With all-in pricing, the first price fans see should be the price they pay. In other words, fans can see upfront the full ticket price, inclusive of all mandatory fees, from the first time a fan sees a ticket. **This practice allows consumers to comparison shop with greater ease and certainty, eliminating the surprise of added fees when the consumer proceeds to the ticket purchase page.**

. . .

**In many instances, deferring disclosure of mandatory fees is inherently deceptive or unfair.** As explained in Live Nation's 2020 Congressional testimony, some marketplaces take advantage of disclosing the fees later in the purchasing process to deceive customers by manipulating the list price of a ticket, making the ticket price appear less expensive upfront. These marketplaces represent to consumers the price of a ticket that is intentionally reduced, only to add the amount of the reduction (or more) into the fees charged later in a transaction.

Live Nation Comment to Proposed Rule, FTC-2023-0064-3306 (Feb. 7, 2024) (emphasis added, footnote omitted).

131.   Live Nation was clear that there is no technological barrier preventing Ticketmaster from showing consumers the full price of live event tickets from the beginning of the transaction.

132.   Instead, Live Nation explained that "[i]f Ticketmaster implements all-in pricing but other ticketing marketplaces do not, it risks losing site traffic and, ultimately, sales because such other platforms can list a lower price upfront to draw in consumers, even if their final price once fees are added is higher than the price offered by Ticketmaster."

133.   Defendants thus recognize (1) that the artificially low price advertised at the start of the transaction is deceptive, (2) that it is no more difficult to show the full ticket price to consumers from the beginning, and (3) that it is better for their

bottom line to continue using dark patterns to interfere with consumer decision making.

## CLASS ALLEGATIONS

134.   This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), including Sections (b)(1), (b)(2) and (b)(3) of Rule 23. Plaintiffs seek certification of the following classes:

## CALIFORNIA

135.   Plaintiff Michelle Madrigal seeks certification of the following California class (the "**California Class**"), consisting of the following individuals:

> All residents of the California who, during the Class Period, paid an Added Fee to Defendants through the desktop or mobile versions of https://www.livenation.com  or  https://www.ticketmaster.com  or through Defendants' Apps where the price initially displayed to the consumer did not include the amount of the Added Fee.

## NEW YORK

136.   Plaintiff Jessica Tempest seeks certification of the following New York class (the "**New York Class**"), consisting of the following individuals:

> All residents of the New York who, during the Class Period, paid an Added Fee to Defendants through the desktop or mobile versions of https://www.livenation.com  or  https://www.ticketmaster.com  or through Defendants' Apps where the price initially displayed to the consumer did not include the amount of the Added Fee.

## ILLINOIS

137.   Plaintiff Tracey Sunde seeks certification of the following Illinois class (the "**Illinois Class**"), consisting of the following individuals:

> All residents of the Illinois who, during the Class Period, paid an Added Fee to Defendants through the desktop or mobile versions of https://www.livenation.com  or  https://www.ticketmaster.com  or through Defendants' Apps where the price initially displayed to the consumer did not include the amount of the Added Fee.

**FLORIDA**

138.   Plaintiff Helen Pantuso seeks certification of the following Florida class (the "**Florida Class**"), consisting of the following individuals:

> All residents of the Florida who, during the Class Period, paid an Added Fee to Defendants through the desktop or mobile versions of https://www.livenation.com or https://www.ticketmaster.com or through Defendants' Apps where the price initially displayed to the consumer did not include the amount of the Added Fee.

139.   Unless otherwise specified, all the classes are collectively referred to as the "Classes," and their members are collectively referred to as the "Class members."

140.   Defendants' deceptive fee practices violated each Class member's individual statutory right to truthful information from Defendants about the actual price of live event tickets purchased from Defendants.

141.   Defendants' deceptive fee practices have resulted in actual injury and harm to the Class members in the amount of the fees which were absent from the advertised price and which they paid as a result of Defendants' drip and/or partitioned fee practices.

142.   Plaintiffs explicitly reserve their right to amend, add to, modify, and/or otherwise change the proposed class definitions as discovery in this action progresses.

143.   The following people are excluded from any of the Classes: (1) any Judge or Magistrate Judge presiding over this action, members of their staffs (including judicial clerks), and members of their families; and (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest, and their current or former employees, officers and directors.

144.   At this time, Plaintiffs do not know the exact number of Class members; however, given the nature of the claims and the number of complaints, Plaintiffs

1    believe that the Class members are so numerous that joinder of all members is
2    impracticable.

3        145.    There is a well-defined community of interest in the questions of law
4    and fact involved in this case. The questions of law and fact that are common to the
5    Class members and predominate over questions that may affect individual Class
6    members include, but are not limited to:

7            a.    Whether Defendants misrepresented the actual cost of tickets to
8                  consumers;

9            b.    Whether Defendants omitted material pricing information from
10                 the advertised prices of tickets;

11           c.    Whether Defendants knew their unfair and deceptive sales tactics
12                 would induce higher sales;

13           d.    Whether Defendants' marketing, advertising, and/or selling of
14                 the tickets with misrepresentations constituted an unfair and/or
15                 deceptive trade practice;

16           e.    Whether Defendants participated in and pursued the common
17                 course of conduct complained of herein;

18           f.    Whether Defendants were enriched as a result of the unlawful,
19                 fraudulent, and unfair conduct alleged in this Complaint such that
20                 it would be inequitable for Defendant to retain the benefits
21                 conferred upon it by Plaintiff and the other Class members;

22           g.    Whether Defendants' marketing, advertising, and/or selling of
23                 tickets with misrepresentations violated California's Honest
24                 Pricing Law, Cal. Civ. Code § 1770(a)(29);

25           h.    Whether Defendants' marketing, advertising, and/or selling of
26                 tickets with misrepresentations violated California's Consumers
27                 Legal Remedies Act, Cal. Civ. Code § 1770;

28

i.  Whether Defendants' marketing, advertising, and/or selling of tickets with misrepresentations violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*;

j.  Whether Defendants' marketing, advertising, and/or selling of tickets with misrepresentations violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*;

k.  Whether Defendants' marketing, advertising, and/or selling of tickets with misrepresentations violated New York's Arts & Cultural Affairs Law § 25.01 *et seq.*;

l.  Whether Defendants' marketing, advertising, and/or selling of tickets with misrepresentations violated New York's General Business Law §§ 349, 350;

m.  Whether Defendant's marketing, advertising, and/or selling of tickets with misrepresentations violated Illinois's Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*;

n.  Whether Defendants' marketing, advertising, and/or selling of tickets with misrepresentations violated Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201 *et seq.*; and

o.  Whether Plaintiffs and the Class members are entitled to injunctive relief.

146.  Plaintiffs' claims are typical of those of the Classes because Plaintiffs, like all Class members, were exposed to Defendants' misrepresentations, purchased tickets in a typical consumer setting, and sustained damages from Defendants' wrongful conduct.

147.  Plaintiffs will adequately protect the interests of the Classes and have retained counsel who are experienced in litigating complex class actions. Plaintiffs have no interests that conflict with those of the Classes.

148.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

149.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met, as Defendants have acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Classes as a whole.

150.    Defendants' conduct is generally applicable to the Classes as a whole and Plaintiffs seek, inter alia, equitable remedies with respect to the Classes as a whole. As such, Defendants' systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

151.    The requirements of Fed. R. Civ. P. 23(b)(3) are met as common issues predominate over any individual issues, and treatment of this matter as a class action is superior to numerous individual actions.

152.    The litigation of separate actions by Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not. Additionally, individual actions may be dispositive of the interests of the Classes, although certain Class members are not parties to such actions.

153.    Unless the Classes are certified, Defendants will retain monies received as a result of Defendants' unlawful and deceptive conduct alleged herein. Unless a class-wide public injunction is issued, Defendants will also likely continue to advertise, market, and promote its products and services in an unlawful and misleading manner, and members of the Classes will continue to be misled, harmed, and denied their rights.

CLASS ACTION COMPLAINT

## COUNT I

**Violation of California's Honest Pricing Law**
**Consumers Legal Remedies Act (Cal. Civ. Code § 1770(a)(29))**
**(On Behalf of Plaintiff Madrigal and the California Class)**

154. Plaintiff Madrigal ("Plaintiff" for purposes of this count) incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows:

155. This cause of action is brought pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* (the "CLRA") on behalf of the California Class ("Class members" for purposes of this count).

156. Plaintiff and the Class members are "consumers," as the term is defined by California Civil Code § 1761(d), because she and they bought the tickets at issue for personal, family, or household purposes.

157. Plaintiff and Defendants, and the other Class members and Defendants, have engaged in "transactions," as that term is defined by California Civil Code §1761(e).

158. The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA and the conduct was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods to consumers.

159. Since the Honest Pricing Law went into effect, Defendants have continued to advertise, display, and offer tickets to California residents without including all mandatory fees or charges other than taxes or fees imposed by a government. § 1770(a)(29). Defendants' hidden-fee practices continue to apply to California residents who are physically present in the State of California at the time of booking.

160. Plaintiff and the Class members relied on Defendants' misrepresentations and omissions when making their ticket purchases.

161.   As alleged more fully above, Defendants have violated the CLRA by misrepresenting the price of live-event tickets to Plaintiff and the Class members. Defendants omit certain non-government-imposed mandatory fees from the price they advertise, then, after customers resolve to purchase certain tickets, Defendants reveal the actual, higher price.

162.   Because it was reasonably foreseeable that omitting mandatory fees from the advertised price of tickets would induce Plaintiff and the Class members to spend more than they otherwise would, Defendants proximately caused harm to Plaintiff and the Class members.

163.   As a result of engaging in such conduct, Defendants have violated California Civil Code § 1770(a)(29).

164.   The unfair and deceptive acts and practices of Defendants, as described above, present a serious threat to Plaintiff and the Class members.

165.   Defendants' actions were willful, wanton, and fraudulent.

166.   On March 12, 2025, Plaintiff sent a letter to Defendants pursuant to Cal. Civ. Code §1782 that provided Defendants notice of the misconduct and requested that Defendants cure its misconduct within 30 days (the "CLRA Notice"). A true and correct copy is attached hereto as Exhibit A.

167.   Defendants received the CLRA Notice on March 17, 2025.

168.   Defendants have not corrected or remedied the unlawful conduct after receiving the CLRA Notice, and Defendants continue to engage therein.

169.   Pursuant to California Civil Code § 1780(a)(2) and (a)(5), Plaintiff seeks an order of this Court that includes, but is not limited to, an order requiring Defendants to cease the unlawful acts described herein.

170.   Plaintiff and the Class members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

171.   Pursuant to California Civil Code § 1780(a)(2), Plaintiff also seeks a public injunction to enjoin Defendants' unlawful methods, acts, and practices

alleged herein. If the injunctive relief is not granted, and Defendants are permitted to continue to engage in these practices, California's consumers will continue to suffer harm.

172.    Plaintiff also seeks restitution of property and reasonable costs and attorneys' fees.

173.    If Defendants have not rectified their violations within 30 days of receipt of Plaintiff's notice, Plaintiff will amend this Complaint to seek all damages available pursuant to California Civil Code § 1780(a) and (b), including statutory and punitive damages.

174.    Pursuant to § 1780(d) of the CLRA, attached hereto as Exhibit B is an affidavit showing that this action has been commenced in the proper forum.

**<u>COUNT II</u>**
**Unfair and Deceptive Acts and Practices**
**California Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq*.)**
**(On Behalf of Plaintiff Madrigal and the California Class)**

175.    Plaintiff Madrigal ("Plaintiff" for purposes of this count) incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows:

176.    This cause of action is brought pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*. (the "CLRA") on behalf of California Class members ("Class members" for purposes of this count).

177.    Plaintiff and the Class members are "consumers," as the term is defined by California Civil Code § 1761(d), because she and they bought the tickets at issue for personal, family, or household purposes.

178.    Plaintiff and Defendants, and the other Class members and Defendants, have engaged in "transactions," as that term is defined by California Civil Code §1761(e).

179.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA

40

1  and the conduct was undertaken by Defendants in transactions intended to result in,

2  and which did result in, the sale of goods to consumers.

3  180.    Plaintiff    and    the    Class    members    relied    on    Defendants'

4  misrepresentations and omissions when making their ticket purchases.

5  181.    As alleged more fully above, Defendants have violated the CLRA by

6  misrepresenting the price of live-event tickets to Plaintiff and the Class members.

7  Defendants omit certain non-government-imposed mandatory fees from the price

8  they advertise, then after customers resolve to purchase certain tickets, Defendants

9  reveal the actual, higher price.

10  182.    The deceptively low price initially advertised by Defendants was a

11  substantial factor in Plaintiff's and Class members' decision to purchase tickets.

12  183.    As a result of Defendants' high-pressure sales tactics, Plaintiff and the

13  Class members purchased tickets despite Defendants' hidden fees.

14  184.    Because it was reasonably foreseeable that omitting mandatory fees

15  from the advertised price of tickets would induce Plaintiff and the Class members to

16  spend more than they otherwise would, Defendants proximately caused harm to

17  Plaintiff and the Class members.

18  185.    As a result of engaging in such conduct, Defendants have violated

19  California Civil Code §§ 1770(a)(9), (a)(13), (a)(14), (a)(19), and (a)(20).

20  186.    The unfair and deceptive acts and practices of Defendants, as described

21  above, present a serious threat to Plaintiff and the other Class members.

22  187.    Defendants' actions were willful, wanton, and fraudulent.

23  188.    On March 12, 2025, Plaintiff sent a letter to Defendants pursuant to Cal.

24  Civ. Code §1782 that provided Defendants notice of the misconduct and requested

25  that Defendants cure its misconduct within 30 days (the "CLRA Notice"). A true

26  and correct copy is attached hereto as Exhibit A.

27  189.    Defendants received the CLRA Notice on March 17, 2025.

28

CLASS ACTION COMPLAINT

190. Defendants have not corrected or remedied the unlawful conduct after receiving the CLRA Notice, and Defendants continue to engage therein.

191. Pursuant to California Civil Code § 1780(a)(2) and (a)(5), Plaintiff seeks an order of this Court that includes, but is not limited to, an order requiring Defendants to cease the unlawful acts described herein.

192. Plaintiff and the Class members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

193. Pursuant to California Civil Code § 1780(a)(2), Plaintiff also seeks a public injunction to enjoin Defendants' unlawful methods, acts, and practices alleged herein. If the injunctive relief is not granted, and Defendants are permitted to continue to engage in these practices, California's consumers will continue to suffer harm.

194. Plaintiff also seeks restitution of property and reasonable costs and attorneys' fees.

195. If Defendants have not rectified their violations within 30 days of receipt of Plaintiff's notice, Plaintiff will amend this Complaint to seek all damages available pursuant to California Civil Code § 1780(a) and (b), including statutory and punitive damages.

196. Pursuant to § 1780(d) of the CLRA, attached hereto as Exhibit B is an affidavit showing that this action has been commenced in the proper forum.

## COUNT III
### California's Unfair Competition Law
### (Cal. Bus. & Prof. Code § 17200 *et seq.*)
### (On Behalf of Plaintiff Madrigal and the California Class)

197. Plaintiff Madrigal ("Plaintiff" for purposes of this count) incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows on behalf of the California Class ("Class members" for purposes of this count):

CLASS ACTION COMPLAINT

198.   By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200–10, as to the California Class as a whole, by engaging in unlawful, fraudulent, and unfair conduct.

199.   **Unlawful Conduct.** Defendants have violated the UCL's proscription against engaging in unlawful conduct as a result of violations of the CLRA, Cal. Civ. Code § 1770(a)(9), (a)(13), (a)(14), (a)(19), (a)(20), and (a)(29), as alleged above.

200.   **Unfair Conduct.** Defendants' acts and practices described above also violate the UCL's proscription against engaging in unfair conduct.

201.   Plaintiff and the Class members suffered a substantial injury by virtue of buying tickets that they would not have purchased or paying more for tickets than they otherwise would have absent Defendants' unlawful, fraudulent, and unfair advertising.

202.   There is no benefit to consumers or competition from such deception, other than to increase Defendants' own profits.

203.   The gravity of the consequences of Defendants' conduct as described above outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace. In fact, Defendants have shown they can sell tickets without deceptive ticket prices through their "All-In Pricing." Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the Class members.

204.   **Fraudulent Conduct.** Defendants' acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct.

205.   The representations and omissions constitute "fraudulent" business acts and practices because they are false and misleading to Plaintiff and the Class members.

CLASS ACTION COMPLAINT

206.   Defendants' representations and omissions deceived Plaintiff and the Class members.

207.   Defendants knew or reasonably should have known that their statements and omissions were likely to deceive consumers.

208.   Plaintiff and the Class members suffered a substantial injury by virtue of buying tickets that they would not have purchased and/or paying more for tickets than they would have absent Defendants' unlawful, fraudulent, and unfair misrepresentations or by virtue of paying an excessive premium price for the unlawfully, fraudulently, and unfairly priced products.

209.   Plaintiff and the Class members had no way of reasonably knowing that the tickets they purchased were not as marketed or advertised and/or the true price of tickets. As a result of Defendants' misrepresentations and high-pressure sales tactics, they could not have reasonably avoided the injury each of them suffered.

210.   Defendants' violations of the UCL continue to this day. Pursuant to California Business and Professional Code § 17203, Plaintiff and the Class members seek an order of this Court that includes, but is not limited to, an order requiring Defendants to cease and desist the unlawful practices described herein.

211.   Plaintiff also seek restitution on behalf of Plaintiff and the Class members and disgorgement of all revenues obtained as a result of the violation violations of the UCL.

212.   Plaintiff further seeks an award of attorneys' fees and costs.

**COUNT IV**
**Violation of California's False Advertising Law**
**(Cal. Bus. & Prof. Code § 17500 *et seq*.)**
**(On Behalf of Plaintiff Madrigal and the California Class)**

213. Plaintiff Madrigal ("Plaintiff" for purposes of this count) incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows on behalf of the California Class ("Class members" for purposes of this count):

214. The False Advertising Law prohibits making any false or misleading advertising claim.

215. Defendants make false and misleading advertising claims by deceiving consumers as alleged herein.

216. Defendants advertised to Plaintiff and the Class members deceptively low ticket prices. Those advertisements were false because Defendants failed to include in the prices mandatory junk fees.

217. In reliance on these false and misleading advertising claims, Plaintiff and the Class members purchased tickets without the knowledge that they were not as advertised.

218. Defendants knew or should have known that its representations and omissions were likely to deceive consumers.

219. Defendants proximately caused Plaintiff and the Class members injuries because it was reasonably foreseeable that Plaintiff and the Class members would spend more on live event tickets than if the fees were included in the first-advertised price.

220. As a result, Plaintiff and the Class members seek injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

## COUNT V
### Violations of the New York Arts & Cultural Affairs Law
### (New York Arts & Cultural Affairs Law § 25.01 *et seq*.)
### (On Behalf of Plaintiff Tempest and the New York Class)

221. Plaintiff Tempest ("Plaintiff" for purposes of this count) incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows on behalf of the New York Class ("Class members" for purposes of this count):

222. Pursuant to New York Arts & Cultural Affairs Law § 25.07(4), Defendants operate "platform[s] that facilitate[] the sale or resale of tickets."

CLASS ACTION COMPLAINT

223.    Pursuant to § 25.07(4), Defendants must "disclose the total cost of the ticket, inclusive of all ancillary fees that must be paid to purchase the ticket . . . prior to the ticket being selected for purchase. The price of the ticket shall not increase during the purchase process[.]" N.Y. Arts & Cult. Aff. Law § 25.07(4).

224.    Defendants, through their failure to disclose the "total cost of a ticket, inclusive of all ancillary fees that must be paid in order to purchase the ticket" until after a ticket is selected for purchase, have violated New York Arts & Cultural Affairs Law § 25.07(4).

225.    Moreover, Defendants violated § 25.07(4) by increasing the total cost of tickets during the purchase process.

226.    Furthermore, Defendants violated New York Arts & Cultural Affairs Law § 25.07(4) by failing at the first stage to "disclose in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a service charge, or any other fee or surcharge to the purchaser."

227.    Defendants added "fees," including but not limited to the order processing fee, constitute an "ancillary fee[] that must be paid in order to purchase the ticket." § 25.07(4).

228.    Plaintiff and the Class members purchased tickets through Defendants' website and were forced to pay Defendants' added fees to secure their tickets.

229.    Plaintiff and the Class members were harmed by paying these added charges because the total cost was not disclosed to Plaintiff at the beginning of the purchase process.

230.    Plaintiff and the Class members seek an order enjoining the unlawful conduct described herein, the greater of actual damages or statutory damages of $50 per violation, reasonable attorneys' fees, and costs. *See* N.Y. Arts & Cult. Aff. Law § 25.33.

CLASS ACTION COMPLAINT

## COUNT VI

### Violations of New York General Business Law, § 349
### (On Behalf of Plaintiff Tempest and the New York Class)

231.   Plaintiff Tempest ("Plaintiff" for purposes of this count) incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows on behalf of the New York Class ("Class members" for purposes of this count):

232.   New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

233.   In their sale of live event tickets to customers in New York and throughout the United States, Defendants conducted business and trade within the meaning and intendment of New York General Business Law § 349.

234.   Plaintiff and the Class members are each consumers who purchased tickets from Defendants.

235.   By the acts and omissions alleged herein, Defendants have engaged in deceptive and misleading acts and practices designed to sell tickets at prices higher than they advertised and promised to consumers, and to covertly and improperly squeeze additional money from its customers for its own profit by unilaterally imposing mandatory fees.

236.   By reason of this conduct, Defendants have engaged and continue to engage in deceptive acts and practices in violation of the New York General Business Law § 349.

237.   Defendants' deceptive acts, misrepresentations, and omissions have a tendency to deceive, and in fact deceived, the general public, including Plaintiff and the Class members.

238.   Defendants' deceptive acts, misrepresentations, and omissions were and are material, in that they were likely to, and did in fact, mislead reasonable consumers acting reasonably under the circumstances.

CLASS ACTION COMPLAINT

239. Defendants' deceptively low initially advertised prices were a substantial factor in Plaintiff and the Class members' decision to purchase tickets from Defendants.

240. Defendants' high pressure purchase flow as detailed herein caused Plaintiff and the Class members to purchase tickets despite the final disclosure of the previously hidden fees.

241. Although not required by New York law, Plaintiff and the Class members reasonably relied on Defendants' material misrepresentations, omissions, and deceptive policies and practices, and would not have purchased tickets from Defendants, or would not have paid as much for said tickets, had Defendants not misrepresented the cost of tickets and engaged in high-pressure sales tactics.

242. Defendants knowingly and willingly committed these deceptive acts and practices for their own profit and for the profit of their shareholders.

243. As a direct and proximate result of Defendants' deceptive actions, Plaintiff and the Class members have been harmed and have lost money or property in the amount of the late disclosed mandatory fees that they paid to Defendants.

244. Defendants' actions were the direct, foreseeable, and proximate cause of the damages that Plaintiff and the Class members have sustained from having paid for and consumed Defendants' services.

245. As a result of Defendants' deceptive actions and practices, Plaintiff and the Class members have suffered damages and are entitled to recover those damages or $50, whichever is greater.

246. Plaintiff and the Class members are also entitled to treble damages up to $1,000 because Defendants willfully and knowingly committed deceptive acts and practices in violation of New York General Business Law § 349.

247. Plaintiff and the Class members are also entitled to an injunction to halt Defendants' unlawful deceptive practices and to initiate a program to provide refunds and/or restitution to Plaintiff and the Class members.

248.   Plaintiff is also entitled to reasonable attorneys' fees from Defendants.

## COUNT VII
### Violations of New York General Business Law, § 350
### (On Behalf of Plaintiff Tempest and the New York Class)

249.   Plaintiff Tempest ("Plaintiff" for purposes of this count) incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows on behalf of the New York Class ("Class members" for purposes of this count):

250.   New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

251.   Defendants' material misrepresentations, omissions, and failures to disclose as described herein also constitute false advertising in violation N.Y. Gen. Bus. Law § 350, which broadly declares unlawful all "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

252.   Section 350-e allows any person who has been injured by any violation of section 350 or section 350-a to bring an action to recover actual damages or $500, whichever is greater, as well as to obtain an injunction to enjoin the unlawful false advertising. N.Y. Gen. Bus. Law § 350-e(3).

253.   By the acts and omissions alleged herein, including, *inter alia*, advertising and promising prices for tickets that were not the true prices that they ultimately charged to customers, and failing to disclose the existence or amount of various mandatory fees when advertising the prices of tickets, Defendants have directly violated New York General Business Law § 350, causing damage to Plaintiff and the Class members.

254.   By reason of this conduct, Defendants have engaged in false advertising in violation of the New York General Business Law § 350.

CLASS ACTION COMPLAINT

255.   Defendants' false advertising has a tendency to deceive, and in fact deceived, the general public, including Plaintiff and the Class members.

256.   Defendants' false advertising is and was material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

257.   The deceptively low price advertised by Defendants was a substantial factor in Plaintiff's and Class members' decision to purchase tickets on Defendants' website.

258.   Although not required by New York law, Plaintiff and the Class members reasonably relied on Defendants' false advertising and would not have purchased live event tickets from Defendants or would not have paid as much for said tickets, had they known that Defendants advertised and promised prices were false.

259.   Defendants knowingly and willingly made these false advertisements and misrepresentations for their own profit and for the profit of their shareholders.

260.   As a direct and proximate result of Defendants' false advertising, Plaintiff and the Class members have been harmed and have lost money or property in the amount of the mandatory fees that they paid to Defendants.

261.   Defendants' actions were the direct, foreseeable, and proximate cause of the damages that Plaintiff and the Class members have sustained from having paid for tickets.

262.   As a result of Defendants' false advertising, Plaintiff and each Class member have suffered damages and are therefore entitled to recover those damages or $500 per person (whichever is greater).

263.   Plaintiff and each Class member are also entitled to treble damages up to $10,000 because Defendants willfully and knowingly conducted false advertising in violation of New York General Business Law § 350.

CLASS ACTION COMPLAINT

264.  Plaintiff and each Class member are also entitled to an injunction to halt Defendants' unlawful false advertising and to initiate a program to provide refunds and/or restitution to Plaintiff and the class.

265.  Plaintiff is also entitled to reasonable attorney's fees from Defendants.

<u>**COUNT VIII**</u>
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
***Unfair and Deceptive Practices***
**815 ILCS 505/1 *et seq*.**
**(On Behalf of Plaintiff Sunde and the Illinois Class)**

266.  Plaintiff Sunde ("Plaintiff" for purposes of this count) incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows on behalf of the Illinois Class ("Class members" for purposes of this count):

267.  815 ILCS 505/2 probits the use of "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'"

268.  Plaintiff and the Class members are each consumers who purchased tickets from Defendants.

269.  By the acts alleged herein, including by obscuring the true price of tickets and utilizing a high-pressure purchase flow, Defendants have engaged in unfair acts and practices in violation of 815 ILCS 505/2.

270.  Plaintiff and the Class members suffered a substantial injury by virtue of buying tickets that they would not have purchased and/or paying more for tickets

1    than they otherwise would have absent Defendants' unlawful, fraudulent, and unfair

2    advertising.

3        271.    There is no benefit to consumers or competition from such deception,

4    other than to increase Defendants' own profits.

5        272.    The gravity of the consequences of Defendants' conduct as described

6    above outweighs any justification, motive, or reason therefore, particularly

7    considering the available legal alternatives which exist in the marketplace. In fact,

8    Defendants have shown they can sell tickets without deceptive ticket prices through

9    their "All-In Pricing." Such conduct is immoral, unethical, unscrupulous, offends

10   established public policy, or is substantially injurious to Plaintiff and the Class

11   members.

12       273.    Plaintiff and the Class members had no way of reasonably knowing that

13   the tickets they purchased were not as marketed or advertised and/or the true price

14   of tickets. As a result of Defendants' misrepresentations and high-pressure sales

15   tactics, they could not have reasonably avoided the injury each of them suffered.

16       274.    By the acts and omissions alleged herein, Defendants have engaged in

17   deceptive and misleading acts and practices designed to sell tickets at prices higher

18   than they advertised and promised to consumers, and to covertly and improperly

19   squeeze additional money from its customers for its own profit by unilaterally

20   imposing mandatory fees. Specifically, Defendants advertise a deceptively low price

21   that does not include Defendants' hefty fees to lure consumers into purchasing

22   tickets.

23       275.    By reason of this conduct, Defendants have engaged and continue to

24   engage in deceptive acts and practices in violation of the 815 ILCS 505/2.

25       276.    Defendants' deceptive acts, misrepresentations, and omissions have a

26   tendency to deceive, and in fact deceived, the general public, including Plaintiff and

27   the Class members.

28

CLASS ACTION COMPLAINT

277.    Defendants' deceptive acts, misrepresentations, and omissions were and are material, in that they were likely to, and did in fact, mislead reasonable consumers acting reasonably under the circumstances.

278.    Although not required by Illinois law, Plaintiff and the Class members reasonably relied on Defendants' material misrepresentations, omissions, and deceptive policies and practices, and would not have purchased tickets from Defendants, or would not have paid as much for said tickets, had they known the truth about Defendants' policies and practices.

279.    Defendants knowingly and willingly committed these deceptive acts and practices for their own profit and for the profit of their shareholders.

280.    As a direct and proximate result of Defendants' deceptive actions, Plaintiff and the Class members have been harmed and have lost money or property in the amount of the undisclosed, extra-contractual mandatory fees that they paid to Defendants.

281.    Defendants' actions were the direct, foreseeable, and proximate cause of the damages that Plaintiff and the Class members have sustained from having paid for and consumed Defendants' services.

## COUNT X
### Violations of the Florida Deceptive and Unfair Trade Practices Act
#### *Unfair and Deceptive Practices*
### Fla. Stat. Ann. § 501.201 *et seq.*
### (On Behalf of Plaintiff Pantuso and the Florida Class)

282.    Plaintiff Pantuso ("Plaintiff" for purposes of this count) incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows on behalf of the Florida Class ("Class members" for purposes of this count):

283.    Florida Statute Annotated § 501.204 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

284.   In their sale of live event tickets to customers in Florida and throughout the United States, Defendants conducted business and trade within the meaning and intendment of Fla. Stat. Ann. § 501.201.

285.   Plaintiff and the Class members are each consumers who purchased tickets from Defendants.

286.   By the acts alleged herein, including by obscuring the true price of tickets and utilizing a high-pressure purchase flow, Defendants have engaged in unfair acts and practices in violation of Fla. Stat. Ann. § 501.204.

287.   By the acts and omissions alleged herein, Defendants have engaged in deceptive and misleading acts and practices designed to sell tickets at prices higher than they advertised and promised to consumers, and to covertly and improperly squeeze additional money from its customers for its own profit by unilaterally imposing mandatory fees.

288.   By reason of this conduct, Defendants have engaged and continue to engage in deceptive acts and practices in violation of the Fla. Stat. Ann. § 501.201.

289.   Defendants' deceptive acts, misrepresentations, and omissions have a tendency to deceive, and in fact deceived, the general public, including Plaintiff and the Class members.

290.   Defendants' deceptive acts, misrepresentations, and omissions were and are material, in that they were likely to, and did in fact, mislead reasonable consumers acting reasonably under the circumstances.

291.   Although not required by Florida law, Plaintiff and the Class members reasonably relied on Defendants' material misrepresentations, omissions, and deceptive policies and practices, and would not have purchased tickets from Defendants, or would not have paid as much for said tickets, had they known the truth about Defendants' policies and practices. *See Bechor v. Simcenter, Inc.*, 394 So. 3d 666, 669 (Fla. Dist. Ct. App. 2024) ("[U]nlike fraud, a party asserting a

deceptive trade practice claim need not show actual reliance on the representation or omission at issue.").

292. Defendants knowingly and willingly committed these deceptive acts and practices for their own profit and for the profit of their shareholders.

293. As a direct and proximate result of Defendants' deceptive actions, Plaintiff and the Class members have been harmed and have lost money or property in the amount of the undisclosed, extra-contractual mandatory fees that they paid to Defendants.

294. Defendants' actions were the direct, foreseeable, and proximate cause of the damages that Plaintiff and the Class members have sustained from having paid for and consumed Defendants' services.

295. As a result of Defendants' deceptive actions and practices, Plaintiff and the Class members have suffered damages and are entitled to recover those damages. Plaintiff and the Class members are also entitled to an injunction to halt Defendants' unlawful deceptive practices and to initiate a program to provide refunds and/or restitution to Plaintiff and the Class members. Plaintiff is also entitled to reasonable attorneys' fees from Defendants. Fla. Stat. Ann. § 501.211.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, request that this Court:

(a)    Certify this case as a class action and appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

(b)    Award Plaintiffs and Class Members declaratory relief as permitted by law or equity;

(c)    Award Plaintiffs and Class Members actual, incidental, and consequential damages and available forms of recovery in an amount to be proven at trial, including any and all available

1   compensatory damages, punitive damages, statutory damages, any
2   applicable penalties and interest;

3   (d)   Award all reasonable costs and attorneys' fees incurred by
4   Plaintiffs, pursuant to, without limitation, the California Legal
5   Remedies Act and California Code of Civil Procedure § 1021.5;

6   (e)   Set a trial by jury of all matters; and

7   (f)   Award such other and further relief as the Court may deem just and
8   equitable.

9   ## JURY DEMAND

10  Plaintiffs demand a trial by jury by the maximum number of jurors permitted
11  by law.

12

13  Date: March 18, 2025          */s/ Annick Persinger*

14  Annick Persinger (State Bar No. 272996)
    **TYCKO & ZAVAREEI LLP**
15  10880 Wilshire Blvd., Suite 1101
16  Los Angeles, CA 90024
    Telephone: (510) 254-6808
17  Facsimile: (202) 973-0950
18  *apersinger@tzlegal.com*

19  Shana Khader (*pro hac vice to be filed*)
20  Robert M. Devling (*pro hac vice to be filed*)
    **TYCKO & ZAVAREEI LLP**
21  2000 Pennsylvania Ave., N.W., Suite 1010
22  Washington, D.C. 20006
    Telephone: (202) 919-5852
23  Facsimile: (202) 973-0950
    *skhader@tzlegal.com*
24  *rdevling@tzlegal.com*
25

26  *Counsel for Plaintiffs and the Proposed*
    *Classes*
27

28